UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JIM ADAM ROTH,                                    CIVIL NO. 06-4574 (MJD/JSM)

      Plaintiff,

v.                                               <u>REPORT AND RECOMMENDATION</u>

NANETTE M. LARSON, JAN HANLON,
DR. DAVID PAULSON, JUDY ELLERBUSH,
NOLA KAROL, J. CARTER, DR. GREG SALMI,
FARIBAULT HEALTH SERVICES, DEPARTMENT
OF CORRECTIONS, JASON MATH,
DR. QUANBECK, CONNIE ROEHRICH, LT.
CLIFFORD, LT. MCSHEA, SGT. JOHNSON,
OFFICER MCHUGO, OFFICER POLMANN,
OFFICER THOMPSON, OFFICER
PERSING, ALICE REMILLARD AND DR. CRAIG
BELCOURT,

      Defendants.


JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon Defendants Ellerbusch, Salmi and Quanbeck's Motion to Dismiss for Insufficiency of Service of Process and Failure to State a Claim Upon Which Relief Can Be Granted [Docket No. 54], and upon Motion to Dismiss and for Summary Judgment of Defendants Larson, Hanlon, Paulson, Carter, Math, Karol, Roehrich, Clifford, McShea, Johnson, McHugo, Polmann, Thompson, Persing, Remillard, Faribault Health Services and Department of Corrections [Docket No. 59].   This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.

In addition, because it relates to the outcome of the above motions, this Court will also address in this Report and Recommendation plaintiff's previously filed Motion for Discovery of Names of Successors of Defendants from Defendant Connie Roerich and Motion for Substitution of Parties [Docket No. 22] in which plaintiff sought to discover the names of the successors of Dr. Quanbeck and Judy Ellerbusch and to require that the Summons be served on these successors.

## I.    FACTUAL BACKGROUND

Plaintiff, Jim Adam Roth, is a resident at the Faribault Correctional Facility in Faribault, Minnesota ("MCF-Faribault").  Complaint, p. 3.  [Docket No. 1].  Plaintiff has a number of major physical disabilities that significantly limit his ability to move.  Id., p. 3. Specifically, plaintiff alleged that he has had a history of polio since age three, and consequently, he has massive weakness and atrophy in his upper and lower extremities.  Id., pp. 3, 6.  Plaintiff is confined to a motorized wheelchair.  Id., pp. 3, 5.

Plaintiff has filed a civil rights action under 42 U.S.C. §1983 against various staff and others associated with the Minnesota Department of Corrections ("DOC") at MCF-Faribault alleging that he has failed to receive proper treatment and medication and been denied medical accommodations in violation of his rights under the Eighth and Fourteenth Amendment.  Complaint, pp. 5-6.

Plaintiff has asserted 11 separate claims against the various defendants which he maintains show deliberate indifference to his rights in violation of the Eighth and Fourteenth Amendments, state law, and Department of Corrections policies.  In Claim 1, plaintiff alleged that he was denied proper medical care from defendant Jason Math, R.N., and that Nurse Math falsified his medical records.  Complaint, p. 10.  Plaintiff

further alleged that defendant Dr. Greg Salmi denied plaintiff pain medication that had been prescribed by defendant Dr. Craig Belcourt because it was too expensive.  Id.

In support of Claim 1, plaintiff alleged that on March 29, 2004, he vomited black blood.  A prison officer called for a nurse and Nurse Math arrived; plaintiff agreed to take some Maalox and asked Nurse Math if he was going to take plaintiff's blood pressure, and Nurse Math said he had not brought a blood pressure cuff.[1]  Id.  Nurse Math returned with some Maalox, and after ingesting it, plaintiff vomited more black blood.  Id., p. 11.  Nurse Math checked plaintiff's pulse and without taking plaintiff's blood pressure, told plaintiff to return to bed and that black blood was nothing to worry about.  Id.  Plaintiff then collapsed, someone called for an ambulance, and plaintiff was treated at District One Hospital.  Id.  On October 20, 2005, plaintiff discovered that Nurse Math had falsified plaintiff's medical report by stating that he had taken plaintiff's blood pressure, and by omitting the information that Nurse Math had told plaintiff to return to bed, that plaintiff had collapsed, and it was at that point, that an ambulance was called.  Id., p. 12.  Plaintiff also alleged that Nurse Math used the assessment of the ambulance personnel, specifically that the ambulance personnel took plaintiff's blood pressure, to falsify the report to make it look proper.  Id.  Plaintiff further contended that Health Services had knowledge of the falsified report.  Id.

While he was at District One Hospital on March 29, 2004, plaintiff was treated by Dr. Craig Belcourt in the emergency room.  Id., p. 13.  Dr. Belcourt prescribed Vicodin

---

[1]    In his Complaint, plaintiff refers to a "blood pressure cup."  See Complaint, p. 10. The Court notes that the name of the medical device usually placed around the upper of the arm to measure blood pressure is generally known as a blood pressure cuff. http://healthlibrary.brighamandwomens.org/Library/AdultLibrary/Cardiovascular/85,P00222#B.

for the pain.  Id.  Later that same day, plaintiff was seen by Dr. Greg Salmi at MCF-Faribault.  Id.  When plaintiff informed Dr. Salmi as to the lack of care he received from Nurse Math, Dr. Salmi did not comment.  Id.  Dr. Salmi also stated that he would not prescribe plaintiff Vicodin because it was too expensive and it was illegal to give plaintiff Vicodin; instead Dr. Salmi indicated that he would give plaintiff Tylenol #3 despite plaintiff's complaint that Tylenol #3 upset his stomach.  Id., p. 14.  After plaintiff complained to nurse Kathy White, the doctor on duty prescribed another pill, Darvocet, that plaintiff claimed was equally difficult for his stomach.  Id.  As a consequence, plaintiff alleged that he suffered for many days.  Id.

In Claim 1-A, plaintiff alleged that on July 1, 2006, after ending a visit with third parties, defendant Officer Persing instructed plaintiff to undress.  Complaint, p. 16. Plaintiff claimed that all other officers knew of his disability and would just pat him down after a visit.  Id.  Plaintiff further alleged that it was "policy and de facto policy" that paraplegic and quadriplegic prisoners are not forced to undress themselves, but rather require medical aides to assist them in dressing and undressing so as to avoid great difficulty and pain.  Id.  According to plaintiff, Officer Persing did not call anyone to assist plaintiff in getting dressed and undressed.  Id.  Plaintiff felt pain in his back the following day and went to Health Services, where Nurse Liverseed prescribed plaintiff Motrin for one week and put plaintiff on a list to see the doctor.  Id., p. 18.

In Claim 2, plaintiff alleged that on March 30, 2004, plaintiff was still dizzy and weak from his collapse and hospital visit on March 29, 2004.  Complaint, p. 19.  Plaintiff went to work and asked defendant Officer Carol McHugo if he had to go to work that

day, and Officer McHugo stated "What, you didn't go to work yesterday?"  Id.  Officer

McHugo ordered plaintiff to go to work.  Id., p. 20.

In Claim 3, plaintiff alleged that he has been an inmate at MCF-Faribault since

July 1, 2002, and that he has a medical authorization to use the bathroom at any time,

even during count.  Complaint, p. 21.  Plaintiff stated that there are not enough toilets

for the number of inmates in his hallway of the prison, and that as a result over the

years, he has defecated on himself many times.  Id.  Plaintiff also has a problem using

the toilet because non-handicapped prisoners use the handicapped toilet, or people

urinate or defecate all over the toilet and floor and there are no paper towels to clean up

the mess.  Id., p. 22.  Plaintiff alleged that he is unable to clean up these messes

himself and must wait for another person to clean the bathroom if he wants to use it

during count.  Id.  Plaintiff stated that he has complained of this situation to defendants

Lt. Clifford and Sgt. Johnson, who told plaintiff they could not control who used the

toilets.  Id., p. 21.

In Claim 4, plaintiff alleged that prison staff, pursuant to policy, have allowed

other prisoners to have control over plaintiff and to assist plaintiff, in violation of his

Eighth and Fourteenth Amendment rights, state law, and Department of Corrections

Policies 202.055 and 202.250.  Complaint, p. 23.  In particular, plaintiff stated that while

he was incarcerated at the Dakota County Jail until he entered Oak Park Heights

Correctional Facility on September 17, 2001, personal care attendants hired by the jail

assisted plaintiff in his daily care.  Id., p. 23.  On July 1, 2002, plaintiff was transferred to

MCF-Faribault.  Id., p. 24.  At both Oak Park Heights Correctional Facility and MCF-

Faribault, inmates assisted plaintiff with his daily care instead of professional care

givers. Id., pp. 23, 24.  Plaintiff also alleged that when he arrived at MCF-Faribault, the offender assigned to assist him informed him that he was gay.  Id., p. 24.  Within two weeks, the assistant asked plaintiff if he needed help in the shower; plaintiff said no, and then plaintiff observed the assistant looking at him in the shower.  Id.  Plaintiff was thereafter in fear of being raped by his assistant.  Id.  Plaintiff also alleged that he has been dropped and threatened by inmate assistants who are not trained to handle disabled people.  Id., p. 25.  Plaintiff stated that he complained to prison staff at Oak Park Heights Correctional Facility and MCF-Faribault regarding their use of inmate assistants, but was told that was all he was going to get.  Id.  Plaintiff contended that it is contrary to state and federal laws to use untrained non-medical personnel to assist offenders with disabilities.  Id., p. 23.

In Claim 5, plaintiff alleged that he was denied proper medical attention, examination, and medication for a serious injury by defendant Judy Ellerbusch, a nurse practitioner.  Complaint, p. 26.  On February 20, 2003, plaintiff jumped on the toilet as he did every day, but landed hard on his hip.  Id., p. 26.  The following day, plaintiff felt excruciating pain in his hip and down the back of his leg.  Id.  Plaintiff was told to go to sick call in the morning.  Id.  Plaintiff spoke with his sister regarding the incident, who told him that he had injured his sciatic nerve and that he should see a doctor immediately.  Id., p. 27.  Plaintiff went to sick call the following morning to see a doctor, but was instead seen by Nurse Ellerbusch.  Id.  Nurse Ellerbusch told him the pain would go away soon.  Id.  Plaintiff asked for a physician, and Nurse Ellerbusch told him that she did not think it was serious enough to see a doctor.  Id.  Nurse Ellerbusch did not perform an examination on plaintiff.  Id., p. 28.  Nurse Ellerbusch told plaintiff to take

aspirin when he asked for pain medicine. Id. Plaintiff claims that he suffered for six months because of Nurse Ellerbusch's conduct. Id. On July 19, 2006, plaintiff received treatment from defendant Dr. Quanbeck at the prison, who x-rayed plaintiff's hips and discovered that plaintiff had a healed hip fracture. Id., p. 28-A. Plaintiff contended that Nurse Ellerbusch failed to inquire into essential facts that were necessary to make a professional judgment. Id., pp. 28B-C.

In Claim 6, plaintiff asserted that defendant Nanette Schroeder,[2] Health Services Director, failed to properly investigate his claim that Nurse Math had illegally falsified plaintiff's medical records, failed to address or correct the actions of Nurse Ellerbusch, and failed to correct the issue of unsupervised use of other prisoners as care attendants. Complaint, p. 29. In support of this claim, plaintiff alleged that on June 10, 2005, he filed a complaint and affidavit with the Commissioner and other agencies regarding the maintenance of his wheelchair and with the Department of Corrections regarding the use of inmates for his care. Id. Plaintiff received a letter from Director Schroeder on behalf of Commissioner Fabian, which addressed plaintiff's wheelchair but not the prison's use of inmate assistants. Id. On August 8, 2005, plaintiff sent a letter to Director Schroeder asking why she had failed to respond to the inmate assistance issue, and also informed her that Nurse Math had falsified his medical records and of Nurse Ellerbusch's conduct. Id., pp. 29-30. Plaintiff received a letter from Director Schroeder dated November 8, 2005, which he claimed failed to properly address his concerns, and misdated the incident with Nurse Math. Id., pp. 29-32. The letter indicated that defendant Dr. David Paulson had reviewed plaintiff's claims, and Dr.

---

[2]     Named defendant Nanette Larson is Nanette Schroeder.

Paulson had determined that the report looked good; plaintiff claimed that Dr. Paulson did not investigate his claims.  Id., p. 30.  Director Schroeder also stated that offender personal care attendants were appropriate in certain capacities, and that if attendants were abusive, plaintiff should notify prison staff.  Id., pp. 30-31.  According to plaintiff, the letter failed to address Nurse Ellerbusch's denial of proper medical attention.  Id., p. 32.

In Claim 7, plaintiff alleged that defendant Officer McHugo denied him appropriate accommodations and denied him use of the toilet, and that Health Services, and defendants Jan Hanlon, Health Services Administrator, and Nola Karol,[3] R.N., allowed Officer McHugo, who was non-medical staff, to arrange plaintiff's medical accommodations.  Id., p. 33.  Specifically, on July 28, 2005, at approximately 10:00 a.m., Officer McHugo told plaintiff that they needed to take his electric wheelchair for assessment and repair.  Id.  Plaintiff was assisted by a prisoner attendant into another wheelchair without a transfer belt and that caused him pain.  Id.  This wheelchair was 15 years old, had different parts all over it, including different wheels on the front of the chair which made it sit higher in the front than in the back, and plaintiff could not touch his feet to the ground, making it impossible for plaintiff to transfer himself.  Id., p. 34. Plaintiff claimed that defendants Warden Roehrich, Administrator Hanlon and the nursing staff all knew about these broken wheelchairs and did nothing about them.  Id. At approximately noon, plaintiff had to use the bathroom but was unable to do so until he got his wheelchair back at 1:30 p.m., which caused him bladder pains for about eight

---

[3]    In the Complaint, plaintiff lists Nola Karol as defendant number 10; in Claim 7, plaintiff refers to her as Nola Karow.  Compare Complaint, p. 4 with pp. 33-36.  For the purpose of this Report and Recommendation, the Court refers to her as Karol.

hours.  Id., pp. 34-35.  In addition, as a result of having to use the substitute wheelchair, plaintiff suffered for five days with pains in his neck and back.  Id., p. 35.  Plaintiff alleged that Health Services, Administrator Hanlon, and Nurse Karol knew that he was unable to care for himself without his powered wheelchair but did not give him another powered wheelchair to use.  Id.  Plaintiff sent a kite to Administrator Hanlon and Nurse Karol stating his concerns about the wheelchair, which Nurse Karol answered by thanking plaintiff for bringing the matter to their attention and stating they would discuss arrangements for appropriate accommodations.  Id., p. 36.

In Claim 8, plaintiff alleged he was refused proper medical accommodations by defendants Administrator Hanlon, Director Larson, Lt. Sheila McShea, Sgt. Johnson, Officer Polmann and Safety Director for the D.O.C., Alice Remillard, in connection with plaintiff's request for a space heater for his cell.  Complaint, p. 37.  According to plaintiff, in the winters of 2002 through 2005, he suffered because his cell got extremely cold.  Id. Plaintiff complained to Sgt. Johnson and Officer Polmann, but they did not resolve the problem.  Id.  On October 9, 2005, plaintiff sent a kite to Administrator Hanlon explaining that his cell was extremely cold during the winter months, which caused him to suffer, and requested a space heater.  Id.  Administrator Hanlon told him to address the concerns with his unit staff and that Health Services could not authorize space heaters. Id., p. 38.  Plaintiff sent a second request to Administrator Hanlon, who responded that space heaters were not permitted and that he was to address the issue with his unit.  Id. On October 23, 2005, plaintiff sent a kite to Lt. McShea, explaining how the cold affected his body and asking for a copy of the Fire Marshal's order regarding space heaters; Lt. McShea said she would forward the kite to the safety director.  Id.  On

November 2, 2005, Safety Director Remillard sent a memorandum to plaintiff that plaintiff claimed did not look like it came from the Fire Marshal. Id., pp. 38-39. On April 24, 2006, plaintiff sent a letter to Director Schroeder stating his concerns about the cold, its effect on his body, and staff's refusal to correct the problem. Id., p. 39. Plaintiff asked Director Schroeder for a copy of the Fire Marshal's order. Id. On May 2, 2006, Director Schroeder responded, stating that Safety Director Remillard's November 2, 2005 letter cited the Life Safety Code, Safety Director Remillard was the Fire Marshal, and that as his problem had a medical cause, he should discuss his symptoms with his physician. Id., pp. 39-40. Plaintiff alleged he went to see Dr. Quanbeck, who told plaintiff that there was nothing that he could do for plaintiff. Id., p. 40.

In Claim 9, plaintiff alleged that defendant Officer McHugo subjected him to harassment, personal abuse and deliberate indifference to his medical authorizations and accommodations in connection with his use of the bathroom. Complaint, p. 42. On May 9, 2006, plaintiff went to use the bathroom during head-count. Id. Officer McHugo came by and saw that plaintiff was not in the cell; plaintiff's cellmate told her that plaintiff was in the bathroom. Id. Officer McHugo went to the bathroom and screamed "who's in here?" Id. Plaintiff told Officer McHugo that he had authorization to use the bathroom at any time and that he had seen two officers go by the bathroom.[4] Id., p. 42. According to plaintiff, Officer McHugo then stated that she did not care about his authorization to use the bathroom at any time, and said he was to stay in his cell. Id. Another inmate was in the bathroom at the same time, and Officer McHugo did not say

---

[4] An offender must obtain permission from two counting officers before leaving his cell. McHugo Aff., ¶ 6.

anything to him.  Id., pp. 42-43.  Plaintiff claims that over the past three years Officer McHugo has harassed him 20 to 30 times about the bathroom.  Id., p. 43.

In Claim 10, plaintiff alleged that in May 2005, defendant Officer Tammy Thompson subjected him to harassment, personal abuse and deliberate indifference to his medical condition in connection with his use of the bathroom.  Complaint, p. 44.  On a Friday in May of 2005, plaintiff had to use the bathroom during head count.  Id. Plaintiff went up to the officers' desk and told them that he would be in the bathroom during count and that he had an authorization do so, but Officer Thompson screamed at plaintiff that she did not care if he had an authorization, and that plaintiff was to be in his cell during count.  Id.  Plaintiff began sweating and had pains in his bladder and bowels. Id.  When he was finally permitted to use the bathroom, plaintiff did not make it in time and had a bowel movement in his pants.  Id., p. 45.  As a result of this incident and Officer Thompson's behavior, plaintiff suffered great mental anguish and emotional distress and ridicule.  Id.

In Claim 11, plaintiff alleged he was denied proper medical accommodations by defendants Warden Roehrich, ADA Coordinator Jackie Carter, Director Larson and Lt. Clifford as consequence of having to live at MCF-Faribault without central air conditioning.  Complaint, p. 46.  In support of this claim, plaintiff alleged that since his arrival at MCF-Faribault, plaintiff has suffered every summer from heat.  Id.  In 2005, plaintiff discovered there were central air vents in the medical unit, and that there used to be central air conditioning in the unit but that prison staff took the air conditioning unit for staff offices when their units had broken down.  Id., pp. 46-48.  On several occasions plaintiff thought he was going to die.  Id., pp. 46, 48-49.  Plaintiff sent a kite to

Coordinator Carter about the heat and air conditioning problems.   Id., p. 49.

Coordinator Carter responded that she hoped that they would have air conditioning and

that she could not address the past, and that there were not many other facilities where

there was air conditioning.   Id.

Plaintiff has requested relief in the form of a declaratory judgment and a

permanent injunction against all defendants, and an award of compensatory damages

from the Department of Corrections, Faribault Health Services, and the other

defendants in their individual capacities.   Id., pp. 51-58.   Plaintiff also seeks punitive

damages against all defendants in their individual capacities.   Id., pp. 53-58.

On November 30, 2007, defendants Quanbeck, Ellerbusch and Salmi moved to

dismiss the action for insufficiency of service of process and failure to state a claim

upon which relief can be granted.   See Docket No. 54.   The remaining defendants filed

a motion to dismiss and for summary judgment on the same day.   See Docket No. 59.

## II.   ANALYSIS

### A.   Defendants Ellerbusch, Salmi and Quanbeck's Motion to Dismiss for Insufficiency of Service of Process and Failure to State a Claim Upon Which Relief Can Be Granted. [Docket No. 54]

Defendants Judy Ellerbusch, Gregory Salmi and Stanley Quanbeck move to

dismiss for insufficiency of process and failure to state a claim upon which relief can be

granted.   These defendants all allege that they have never been served with process in

this lawsuit, and that the Court accordingly lacks jurisdiction over each of them.

Ellerbusch et al. Mem. in Support of Mot. to Dism., p. 1 [Docket No. 55].[5]

---

[5]      In their Reply, defendants Ellerbusch, Salmi and Quanbeck noted that Plaintiff's
Response to their motion had not been filed with the Court, despite a Notice of Service
by Mail attached to Plaintiff's Response, in which plaintiff had certified that on
December 20, 2007, he sent an original and two copies of this response to the

With respect to Ellerbusch, Mark Levinger, an attorney with the Minnesota Attorney General's Office, accepted service on behalf of the majority of the defendants, including Ellerbusch.  See Docket No. 29, p. 35.  However, in support of their Motion to Dismiss based on insufficiency of service of process, defendants stated that Ellerbusch was not an employee of the State of Minnesota, she was not represented by the Minnesota Attorney General's Office, and Levinger was not an agent authorized to accept service on her behalf.  Affidavit of Judy Ellerbusch, ¶¶ 3, 4.  [Docket No. 56].

The Summons as to Dr. Quanbeck was returned unexecuted.  See Docket No. 30.  There is a notation on the Summons issued for Dr. Quanbeck, stating that as of July 19, 2007, the U.S. Marshals could not locate him at the address given to them, that he was not an employee of the Department of Corrections, and that he worked at Correction Medical Services.  Id.

The Summons as to Dr. Salmi was also returned unexecuted.  See Docket No. 30.  There is a notation on the summons stating that as of July 19, 2007, the U.S. Marshals could not locate Dr. Salmi at the address provided.  Id.

On May 29, 2007, plaintiff filed a motion for discovery, seeking to learn the names of the successors of defendants Quanbeck, Ellerbusch and Belcourt because

---

Honorable Judge Michael J. Davis.  See Ellerbusch et al. Reply, p. 1. [Docket No. 75]. This Court has checked with both Judge Davis' chambers and the Clerk of Court and neither has received a copy of plaintiff's Response.  Consequently, the Court obtained a copy of plaintiff's Response from counsel for defendants.  Plaintiff also served a Reply to Defendants Reply Memorandum of Law, which he did send a copy to this Court's chambers, however, that Reply was not filed with the Clerk of Court.  This Reply was not permitted by this Court (see Local Rule 7.1(b)(3) and Pretrial Scheduling Order, p. 2).  Contemporaneous with the filing of this Report and Recommendation, this Court has filed with the Clerk of Court copies of Plaintiff's Response and Reply.

they could not be located and served with the Summons.[6]  Pl. Mot., p. 1 [Docket No. 22].  In addition, pursuant to Rule 25 of the Federal Rules of Civil Procedure, plaintiff sought to substitute the successors of Quanbeck, Ellerbusch and Belcourt and serve the Summons on these persons.  Id.  On March 28, 2008, the Court entered an Order, directing defendants to provide certain information to the Court as to the employment and successors of Dr. Quanbeck and Nurse Ellerbusch.  See Order dated March 28, 2008, p. 5.  [Docket No. 78].  The Court also indicated that upon receipt of that information, it would address whether substitution of either Dr. Quanbeck or Nurse Ellerbusch was proper.  Id.

On April 10, 2008, defendants filed a letter with the Court responding to the Court's Order.  See Docket No. 81.  The letter indicated the following: Nurse Ellerbusch was an employee of Correctional Medical Services ("CMS"), which is a private corporation that contracts with the State of Minnesota to provide healthcare to inmates. Nurse Ellerbusch ceased providing nursing services at MCF-Faribault in September 2006.  At the time of the events giving rise to plaintiff's claims against Nurse Ellerbusch, she was working part-time at the Faribault prison on Wednesdays and Thursdays, and the days she did not work at the prison, other healthcare providers provided services to the prison.  Pursuant to its contract with the Department of Corrections, the health services at the various prisons are staffed by a variety of different healthcare providers on any given day.  As such, because Nurse Ellerbusch worked part time at MCF-Faribault, when she stopped working at MCF-Faribault, no one person succeeded her

---

[6]      The Court has already determined that Dr. Belcourt had been properly served, and plaintiff's motion as to Dr. Belcourt was moot.  See March 28, 2008 Order, p. 3. [Docket No. 78].  Plaintiff's motion for discovery did not address service of Dr. Salmi.

and instead, other healthcare providers were assigned to cover the days she previously worked.

As for Dr. Quanbeck, defendants indicated that he was an independent contractor, not an employee, with CMS and he ceased providing services at the Faribault prison in February 2007.  At the time of Dr. Quanbeck's care of plaintiff alleged in the Complaint, Dr. Quanbeck provided services at MCF-Faribault four days a week and the other days were covered by other healthcare providers.  When he ceased working at the MCF-Faribault, Dr. Quanbeck provided services to the prison in Stillwater, and Dr. Peter Troedson, who had provided services at Stillwater, began to work at MCF-Faribault.  Therefore, defendants maintained that no one succeeded Dr. Quanbeck; instead, he and Dr. Troedson switched places.

Under Rule 12 of the Federal Rules of Civil Procedure, a party may move to dismiss claims brought against it for insufficiency of service of process.  See Fed. R. Civ. P. 12(b)(5).  When evaluating a motion to dismiss, courts must view the pleading in the light most favorable to the non-moving party.  See Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994). However, "[o]n a motion to dismiss for insufficient service of process, the court may look beyond the pleadings and examine additional evidence to resolve jurisdictional issues without converting the motion into one for summary judgment."  Medical Graphics Corp. v. Compumedics Sleep PTY, Ltd., No. Civ. 01-1617, 2001 WL 1454026 at *2 (D. Minn. Nov. 15, 2001) (citing McGahn v. F.C. Hayer Co., 84 F. Supp. 540, 541-42 (D. Minn. 1949); Bensusan Restaurant Corp. v. King, 937 F. Supp. 295, 298 (S.D.N.Y. 1996)).

"Proper service of process is necessary because,"'"[i]f a defendant is improperly served, a federal court lacks jurisdiction over the defendant.'" Redding v. Hanlon, 2008 WL 762078 at *5 (D.Minn. March 19, 2008) (citing Printed Media Services, Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir.1993), citing Dodco, Inc. v. American Bonding Co., 7 F.3d 1387, 1388 (8th Cir.1993); see, Murphy Bros., Inc. v. Michetti Pipe Stringing, 526 U .S. 344, 350 (1999); Sieg v. Karnes, 693 F.2d 803, 807 (8th Cir. 1982); Personalized Brokerage Services, LLC v. Lucius, 2006 WL 2975308 at *1 (D.Minn. Oct. 16, 2006)).

Fed. R. Civ. P. 4(e)(1) provides that service of process can be effected upon individuals, "pursuant to the law of the State in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State." Pursuant to Minnesota law, "a plaintiff may effectively serve a summons and complaint by two methods: personally under Minn. R. Civ. P. 4.03 or acknowledgment by mail under Minn. R. Civ. P. 4.05." Turek v. ASP of Moorhead, Inc., 618 N.W.2d 609, 611 (Minn.App. 2000), rev. denied (Minn. Jan. 26, 2001). However, "[s]ervice of process in a manner not authorized by the rule is ineffective service." Id. (quoting Lundgren v. Green, 592 N.W.2d 888, 890 (Minn.App.1999), rev. denied (Minn. July 28, 1999), quoting in turn, Tullis v. Federated Mutual Ins. Co., 570 N.W.2d 309, 311 (Minn. 1997)). In addition, plaintiff "has the ultimate burden [of] establishing the validity of service of process." Redding, 2008 WL 762078 at *6 (quoting A.C. ex rel. M.C. v. Ind. School Dist. No. 152, 2006 WL 3227768 at *4 n. 4 (D.Minn. Nov. 7, 2006), citing Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A., 51 F.3d 1383, 1387 (8th Cir. 1995)). A Court may

dismiss an action without prejudice if service is not made "within 120 days after the filing of the complaint."  Rule 4(m), Federal Rules of Civil Procedure.

        1.   <u>Nurse Ellerbusch</u>

Plaintiff contends that since Nurse Ellerbusch was under contract with the Minnesota Department of Corrections at the time of the violations alleged in his Complaint, the Minnesota Attorney General was the proper place to serve Nurse Ellerbusch.  Pl. Resp. to Def. Mem. in Support of Mot. to Dism. for Insuff. of Service of Process, p. 4.  Plaintiff further argued that the Minnesota Attorney General is competent to ensure that the summons was served upon Nurse Ellerbusch; since Nurse Ellerbusch has obtained counsel and a copy of the Complaint, she should be required to answer it; and since the Attorney General's Office accepted service on her behalf, it was obligated to notify the Court that service was not completed.  Pl. Resp., pp. 4-5.  Therefore, plaintiff maintained that the Court should assume that Nurse Ellerbusch was served.  Pl. Reply to Def. Reply, p. 2.

The Court finds plaintiff's arguments to be without merit.  Nurse Ellerbusch is not bound by the inadvertent actions of the Minnesota Attorney General's Office.  There is nothing in the law to support the proposition that the Minnesota Attorney General can or should be deemed to accept service on behalf of an employee of a private company, CMS, which contracts with the State of Minnesota.  Furthermore, even if Ellerbusch had knowledge of the existence of the suit, that does not effectuate service.  "Under both State, and Federal law, 'actual notice' does not discharge the plaintiff of his duty to effect proper service."  <u>Redding</u>, 2008 WL 762078 at *7 (citing <u>Sieg</u>, 693 F.2d at 807; <u>Willis v. Tarasen</u>, 2005 WL 1705839 at * 2 (D.Minn. July 11, 2005) (same); <u>Turek</u>, 618

N.W.2d at 612; Coons v. St. Paul Cos., 486 N.W.2d 771, 775 (Minn.App. 1992).  See also Hinz v. Washington Mutual Home Loans, No. 03-3203 (DWF/JGL), 2004 WL 729239 at *2 (D.Minn. April 2, 2004) ("Fed.R.Civ.P. 4 places the burden on the plaintiff to properly present a summons for signature and seal by the Court, after which the plaintiff must properly serve the defendants. Even actual notice by a defendant of a suit does not lift the burden of the service requirement from a plaintiff." (citations omitted)).

Pursuant to Federal Rules of Civil Procedure 4(c) and 4(m), a plaintiff is responsible for service of the Summons and Complaint upon defendant within 120 days after the filing of the Complaint.  If plaintiff has not properly served a defendant, then this Court lacks jurisdiction over the defendant.  See Dedco, 7 F.3d at 1388 ("If a defendant is improperly served, the court lacks jurisdiction over the defendant.") (citing Cohen v. Newsweek, Inc., 312 F.2d 76, 77-78 (8th Cir. 1963)).

Here, the Complaint was filed on January 26, 2007.  Therefore, the deadline by which to serve the Summons and Complaint on the defendants in this case was May 26, 2007.  Although the Court is well aware that plaintiff is proceeding pro se and is certainly willing to grant him latitude in that respect, to date, plaintiff has never attempted to locate Nurse Ellerbusch or to re-serve her, nor has he asked this Court grant him more time to effectuate service on her.  Instead, all that plaintiff has done to address the failure to serve Nurse Ellerbusch is to file a motion to substitute Nurse Ellerbusch's successor in place of her.  On this record, the Court concludes that Nurse Ellerbusch was never served with the Summons and Complaint and consequently, the Court lacks personal jurisdiction over Nurse Ellerbusch.  See Hinz,  2004 WL 729239 at *2 ("The Court recognizes that the [Plaintiffs] are proceeding pro se in this matter, and

may therefore not fully appreciate the procedural requirements of bringing a lawsuit in federal court. However, the Court is obligated to uphold the rights and protections afforded Defendants when those Defendants are brought before this Court.").

2.    Dr. Salmi and Dr. Quanbeck

On July 19, 2007, the Summons issued by plaintiff to Drs. Salmi and Quanbeck were returned by the U.S. Marshals as unexecuted.  See Summons and Process Receipts [Docket No. 30].  The Marshals indicated that they were unable to locate Drs. Salmi or Quanbeck at the addresses given.  Id.  In addition, the Marshals noted that Dr. Quanbeck was not an employee of the Department of Corrections, and that he worked at Correction Medical Services.  Id.

Plaintiff states that he did not know that the U.S. Marshals were unable to serve Drs. Salmi and Quanbeck until July 29, 2007.  See Pl. Reply to Def. Reply, p. 2. However, plaintiff brought his motion to substitute parties on May 29, 2007.  That motion addressed plaintiff's inability to locate Dr. Quanbeck, Nurse Ellerbusch, and Dr. Belcourt, and made no mention of Dr. Salmi.  At a minimum, the motion to substitute parties indicated that plaintiff knew that Dr. Quanbeck could not be located and had not been served as of May 29, 2007.  In any event, regardless of the date when plaintiff knew that Dr. Quanbeck and Dr. Salmi had not been served, plaintiff has never asked the Court for permission to extend the deadline for service, or obtained the proper forms and attempted to re-serve them.  Instead, he moved to substitute Dr. Quanbeck's successor for Dr. Quanbeck, and made no further mention of Dr. Salmi until defendants filed this motion.  On this record, the Court finds that neither Dr. Quanbeck nor Dr. Salmi were properly served with the Summons and Complaint in this case, and as such, the

19

Court does not have personal jurisdiction over them.  See King v. Busby, 162 Fed.Appx. 669, 671 (8th Cir. 2006) (court's failure to complete service of process on prison nurse, for purposes of prisoner's § 1983 complaint, was not an abuse of discretion where prisoner failed to provide proper address); Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987) (where defendants had left the Department of Corrections, and efforts made by plaintiff to locate these defendants for purposes of service were unsuccessful, the district court dismissed without prejudice plaintiff's complaint against them because they had not been served with process within 120 days after the filing of the complaint as required by Fed.R.Civ.P. 4(j)); Martin v. Serrell, 2006 WL 488718 at *1 (D.Neb. Feb. 27, 2006) (in dismissing DOC defendants sued in their individual capacity because they could not be located, court held that "[t]he court does everything it can legitimately do, within the court's power, to assist pro se prisoner plaintiffs proceeding in forma pauperis to accomplish service of process on persons who remain employed by the State or a political subdivision of the State.  However, the court cannot become an advocate for, or agent of, either side of a case, and, as a result, tracing defendants who have left their former governmental employment must be left to the devices of a plaintiff and his family, friends or agents.").

Based on the foregoing, the Court recommends that the Motion of Defendants Ellerbusch, Salmi and Quanbeck to Dismiss for Insufficiency of Service of Process be granted, and the claims against them should be dismissed without prejudice.

**B.**   **Motion for Discovery of Names of Successors of Defendants from Defendant Connie Roerich, and Motion for Substitution of Parties. [Docket No. 22]**

As discussed above, on May 29, 2007, plaintiff filed a motion for discovery, seeking to learn the names of the successors of defendants Quanbeck and Ellerbusch and to substitute the successors for these defendants.   On March 28, 2008, the Court ordered defendants to provide certain information as to the employment and successors of Dr. Quanbeck and Nurse Ellerbusch.   The Court also indicated that upon receipt of that information, it would address whether substitution of either Dr. Quanbeck or Nurse Ellerbusch was proper.   Id.

Because the Court has determined that defendants Ellerbusch, Salmi and Quanbeck were not properly served, plaintiff's motion for substitution for the successors of Nurse Ellerbusch and Dr. Quanbeck is denied.   The Court also notes that even if the defendants had been properly served, substitution of parties would not have been appropriate in this case for several reasons.   First, substitution of parties cannot cure improper service upon a defendant.   As none of these defendants have ever been parties to this action because they had never been properly served with the action, there is no "party" to substitute.

Second, Fed. R. Civ. P. 25(d) provides that "[w]hen a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party."   While plaintiff stated in one place in his Complaint that he was suing defendants Ellerbusch, Salmi and Quanbeck in their individual and official capacities (see Complaint, p. 4), a review of the allegations against these

individuals indicates that they were being sued in their individual capacities only.   For example, all of the factual allegations in the Complaint surround the individual actions of the defendants during their medical treatment of plaintiff.   <u>See</u> Complaint, pp. 10, 13-14 (Claim 1); pp. 40 (Claim 8).   Similarly, plaintiff sought monetary and punitive damages directly from the defendants in their individual capacities.   <u>See</u> Complaint, pp. 51, 56. As the United States Supreme Court stated in <u>Kentucky v. Graham:</u>

> Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

473 U.S. 159, 165-66 (1985) (internal citations omitted).

Where as here, the allegations against Dr. Quanbeck and Nurse Ellerbusch concern the personal conduct of each individual, and not the conduct of the holder of the official office, and Rule 25(d) only permits substitution where the "public officer is a party to an action in his official capacity," this Court cannot substitute and legally bind one doctor and nurse in a lawsuit for the individual actions of another doctor and nurse.

Third, there is no authority to support the suggestion that prison doctors and nurses – regardless of their direct employer – may be considered to be "public officials" for purposes of 25(d).   Even if Dr. Quanbeck and Nurse Ellerbusch were employed by the Minnesota Department of Corrections, the fact that the DOC is a public entity does

not convert them from public employees to "public officials."  <u>See</u> <u>generally</u> <u>Hutchinson</u> <u>v. Proxmire</u>, 443 U.S. 111, 119 n.8 (1979) (observing that the category of "public official" cannot be thought to include all public employees).  "At the very least…public official status applies to "those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.'"  <u>Michaelis v. CBS, Inc.</u>, 119 F.3d 697, 702 (8th Cir. 1997) (citing <u>Rosenblatt v. Baer</u>, 383 U.S. 75, 84, 85 (1966)).  Such is not the case here.

For all of these reasons, plaintiff's motion to substitute successors for Dr. Quanbeck and Nurse Ellerbusch is denied.

**C.   Motion to Dismiss and for Summary Judgment of Defendants Larson, Hanlon, Paulson, Carter, Math, Karol, Roehrich, Clifford, McShea, Johnson, McHugo, Polmann, Thompson, Persing, Remillard, Faribault Health Services and Department of Corrections. [Docket No. 59].**

The remaining defendants – Director Larson, Administrator Hanlon, Dr. Paulson, Coordinator Carter, Nurse Math, Nurse Karol, Warden Roehrich, Lt. Clifford, Lt. McShea, Sgt. Johnson, Officer McHugo, Officer Polmann, Officer Thompson, Officer Persing, Safety Director Remillard, Faribault Health Services, and the Department of Corrections – seek dismissal of the claims against them for three reasons.  First, they assert that the claims should be dismissed because plaintiff has failed to properly exhaust his administrative remedies.  Defendants' Memorandum of Law in Support of Motion to Dismiss and for Summary Judgment ("Larson Defs. Mem."), p. 1.  [Docket No. 60].  Second, defendants argue that the claims for damages against the DOC defendants in their official capacities and against the State of Minnesota are barred by the Eleventh Amendment.  <u>Id.</u>  Third, the DOC defendants submit that as a matter of

law they did not violate plaintiff's Eighth Amendment rights, the ADA, the Rehabilitation Act, or the Minnesota Human Rights Act and should be granted qualified immunity and summary judgment. Id., p. 2.

Based on the entire record submitted by the parties in connection with defendants' motion,[7] this Court concludes that plaintiff has failed to properly exhaust his

---

[7]     If defendants' argument that plaintiff did not exhaust his remedies was examined under the standard for a motion to dismiss for failure to state a claim, only the Complaint would be considered.  See Hill v. Holinka, 2008 WL 549928 at *3 (D.Minn. Feb. 27, 2008) (citing Quinn v. Ocwen Federal Bank FSB, 470 F.3d 1240, 1244 (8th Cir. 2006)). But where, as here, the defendants and plaintiff have submitted documents and affidavits to address the exhaustion argument, the Court converts the motion from one to dismiss into one for summary judgment.  See Casazza v. Kiser, 313 F.3d 414, 417-18 (8th Cir. 2002).  See also Fed.R.Civ.P. 12(b)(6) ("If, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56....").

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  DePugh v. Smith, 880 F. Supp. 651, 656 (N.D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).   If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).  "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial."  Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 U.S. Dist. LEXIS 11439, *4-5 (D.Minn. 2003) (citations omitted).  The non-moving party

administrative remedies, and that therefore, his suit should be dismissed without prejudice.[8]

The exhaustion requirement is dictated by the Prison Litigation Reform Act ("PLRA") which states in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); see also McAlphin v. Morgan, 216 F.3d 680, 682 (8th Cir. 2000) (per curiam).

"The PLRA's exhaustion requirement is mandatory." Robley v. Anderson, No. Civ. 02-4199 (JRT/RLE), 2004 WL 742089, at *2 (D.Minn. Mar. 4, 2004) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)) (citation omitted). In this regard, "Congress intended section 1997e(a) to 'curtail the ability of prisoners to bring frivolous and malicious lawsuits by forcing prisoners to exhaust all administrative remedies before bringing suit in Federal court.'" Alexander v Hawk, 159 F.3d 1321, 1324 (11th Cir. 1998) (quoting 141 Cong. Rec. H1472-06, *H1480 (daily ed. Feb. 9, 1995)). The requirement to exhaust administrative remedies also applies to all forms of relief sought. Booth, 532 U.S. at 741 n. 6.

As to the purpose of this requirement, the Eighth Circuit has explained:

---

"must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

[8]   As this Court has concluded that that plaintiff's suit is not properly before it based on his failure to exhaust his administrative remedies, it does not reach defendants' additional challenges based on the Eleventh Amendment, the merits of plaintiff's claims or qualified immunity.

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.   In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation.   In other instances, the internal review might filter out some frivolous claims.   And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

Johnson v. Jones, 340 F.3d 624, 626-27 (8th Cir. 2003); see also Woodford v. Ngo, 548 U.S. 81, 89 (2006) ("Exhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court," and it discourages "disregard of [the agency's] procedures.'") (quoting McCarthy v. Madigan, 503 U.S. 140, 145 (1992)); Robley, 2004 WL 742089, at *2 (quoting Thomas v. Woolum, 337 F.3d 720, 725 (6th Cir. 2003) ("The exhaustion requirement ensures that state prison systems will have an opportunity to handle prison grievances internally before recourse to the federal courts becomes available.").

In addition to being mandatory, "the PLRA exhaustion requirement requires proper exhaustion." Woodford, 548 U.S. at 93 (emphasis added). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules. . . ." Id. at 90.

Under the PLRA, failure to exhaust the available administrative remedies is an affirmative defense, with the burden of proof falling on defendant, and is not a matter of subject matter jurisdiction. Lenz v. Wade, 490 F.3d 991, 993 n. 2 (8th Cir. 2007) (citing Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 919-922, 166 L.Ed.2d 798 (2007)); see also Nixon v. Sanders, 243 Fed.Appx. 197, 198-99 (8th Cir. 2007).

According to defendants, the DOC's records establish that plaintiff never filed a grievance on the issues presented by his Complaint or any other issue with MCF-Faribault or with the Department of Corrections Central Office. Ebeling Aff., ¶ 3. As such, defendants assert that plaintiff has failed to exhaust his administrative remedies and his complaint must be dismissed. Larson Defs. Mem., p. 13. In support of this contention, defendants pointed this Court to the formal grievance procedure adopted by the Minnesota DOC which prescribes a set of administrative remedies that are available to Minnesota state prison inmates. See Ebeling Aff., Exhibit A (Grievance Procedure, DOC Policy No. 303.100 dated June 6, 2006).[9] Pursuant to the policy, inmates must first seek to resolve their grievances informally, by sending a "kite," (i.e., a short written note), to a pertinent prison staff member. Id. If the kite does not resolve the grievance to the inmate's satisfaction, then the inmate must prepare and submit a formal "Offender Grievance form" to the "facility grievance coordinator." Id., p. 2. The formal grievance is investigated by the facility grievance coordinator, who submits the results of his or her investigation to the prison warden/superintendent or designee. Id. The

---

[9] Plaintiff's claims date back to March of 2004, yet defendants only supplied this Court with the operative grievance procedure effective June 6, 2006. As such, the Court obtained from the case Gisege v. Minnesota Department of Corrections, Civ. No. 06-1353 (JRT/RLE), 2007 WL 2892024 (D.Minn. Sept. 28, 2007), the grievance procedures dating back to May 1, 2003. See Gisege Docket No. 43 (Affidavit of Kelly S. Kemp, Exs. 6-9). A review of these procedures indicates that the grievance procedure for the DOC has remained substantially the same since 2003 – the offender first attempts to resolve the issue through kites, and then initiates a formal grievance, followed by a grievance appeal if he or she is still dissatisfied with the response from prison officials. However, prior to December of 2004, the kite procedure and grievance procedure were contained in the same DOC policy, titled Offender/Staff Communication and Grievance Procedure. Id., Exs. 6 and 7. In December of 2004, Policy 303.100 became the Grievance Procedure, and the kite procedure for offender communication was located at 303.101 ("Kites/Communication"). See Plaintiff's Response to the Defendant's Memorandum in Support of Motion to Dismiss and for Summary Judgment, Ex. A.

warden/superintendent (or designee) then rules on the grievance, and the facility grievance coordinator provides written notification to the offender of the warden/superintendent's (or designee's) decision within 20 working days from the date the grievance was logged into the grievance database.  Id.  The warden/superintendent (or designee) may obtain a 20-working day extension provided the offender is notified of the extension within the first 20 working days.  Id., p. 3.  If the offender does not receive a decision within 20 working days of the date the grievance was logged, or within 40 days if the offender received notice of an extension, the offender may consider the grievance dismissed and the offender may appeal the grievance immediately.  Id.

If the inmate is dissatisfied with the decision of the warden/superintendent (or designee), he can appeal that decision by submitting a formal Grievance Appeal form to the DOC's "central office grievance appeal coordinator" within 15 working days of the date the warden/superintendent (or designee) signed the response.  Id.  That person will "[d]etermine the appropriate method of investigating the grievance and submit the investigation results with recommendation to the appropriate assistant or deputy commissioner."  Id.  The assistant or deputy commissioner then makes a final decision on the grievance.  Id., p. 4.  The assistant or deputy commissioner will respond to the appeal within 20 working days from the date the appeal was logged, and may obtain a one-time 20-working day extension, provided the offender is notified of the extension within the first 20 working days.  Id  If the offender does not receive a decision within 20 working days of the date the grievance was logged, or within 40 days if the offender received a notice of extension, the offender may consider the grievance appeal dismissed and the offender may report the matter to the Commissioner for a resolution.

Id. Once a grievance has been resolved by the assistant or deputy commissioner or the Commissioner, there are no further appeals.  Id.  The policy explicitly instructs the offender to "follow the chain of command and contact only one staff at a time."  Id., p. 1.

The grievance policy also permits offenders who have been threatened or are in danger to submit their complaint directly to the central office grievance appeal coordinator for response by the assistant or deputy commissioner.  Id., p. 3.  Under these circumstances, all such decisions processed by the central office are final and there is no second level of appeal.  Id.

In summary, the administrative remedies provided by the DOC are fully exhausted for purposes of § 1997e(a) only when an inmate completes all of the prescribed steps of the DOC Grievance Procedure, and receives a final decision from the assistant or deputy commissioner or Commissioner.

In the Complaint, plaintiff indicated that he "presented the facts relating to his Complaint in the prisoner grievance procedure," by "facts by complaint/or affidavit giving notice."  Complaint, p. 2.  In response to the question "[w]hat steps did you take?", plaintiff stated that he "informed prison staff/officials who had the authority to correct" and that "relief requested was denied, or action taken was unknown to me, and unsatisfying, misconducts continued."  Id.  When asked to provide a copy of the disposition of the grievances, plaintiff indicated that "hearings or actions taken by prison staff, not given to plaintiff."  Id.

In his response to defendants' motion, plaintiff contended that exhaustion of administrative remedies can be achieved by more than one method – i.e. that filing a grievance is not the only avenue; exhaustion of administrative remedies may be

accomplished in the form of kites, complaints, affidavits, informal grievances, letters and notices, as long as notice is given to the individual who has the power to correct the problem and failed to correct the problem.  Pl. Resp. to Def. Mem., p. 4; Pl. Reply to Def. Mem. in Reply to Pl. Response to Motion to Dismiss, p. 2.[10]  Plaintiff submitted that he had exhausted his administrative remedies in that he "wrote kites, complaint [sic], affidavits, and grievances to the staff who has power to address and deal with the particular issues, medical staff on medical issues, or accommodations to medical needs, security staff on security issues or problems, and so on."  Pl. Resp., p. 6.

Additionally, plaintiff contended that defendants have "waived any grounds to ascert [sic] a failure to exhaust administrative remedies since the communications were answered and responded too [sic] by them, or a staff member sequentially higher on the administrative chain, and they failed to correct and allowed the violations to continued."  Pl. Reply, p. 2.  Finally, plaintiff maintained that the DOC policy requiring an inmate to

---

[10]   Plaintiff's Response to the Defendants' Memorandum in Support of Motion to Dismiss and for Summary Judgment, dated December 19, 2007, was not filed with the Clerk of Court and a copy was not sent to this Court's chambers.  Thus, the Court obtained a copy of plaintiff's response from defendants.  Attached to this pleading was a Notice of Service by Mail stating that the original document had been sent to Judge Davis' chambers.  Judge Davis did not receive the pleading.  Additionally, plaintiff submitted a Reply to Defendants' Memorandum in Reply to Plaintiff's Response to Motion to Dismiss and for Summary Judgment, dated January 23, 2008, which was also not filed with the Clerk of Court; however, plaintiff did send a copy of that pleading to this Court's chambers.  Contemporaneous with the filing of this Report and Recommendation, this Court has filed with the Clerk of Court copies of Plaintiff's Response and Reply.

Plaintiff is reminded that in the future all pleadings must be served on all defendants and filed with the Clerk of Court, with an extra copy sent to chambers.  In addition, plaintiff is reminded that the Rules governing motion practice only permit an initial memorandum by the moving party, a response by the party opposing the motion and a reply to that response by the moving party.  See Local Rule 7.1 for the United States District Court for the District of Minnesota.  No reply to the response is permitted.

pay for all copies when filing a grievance causes financial hardship and acts as a deterrent to prisoners filing formal grievances, who like himself, have very limited funds and are unable to pay for copies.  Pl. Resp., pp. 6-7.  As such, plaintiff appears to assert that he was prevented from filing grievances because he could not pay for copies of his kites to attach to a formal grievance, and that copies were a prerequisite to filing a grievance.  Id., pp. 6-7.

Plaintiff has submitted to the Court a large number of exhibits in support of his claims.  Plaintiff's Response to Defendants' Joint Answer and Exhibits A through N for Statement of Claims 1-12.[11]  [Docket No. 35].  These exhibits included numerous offender kite forms and letters that plaintiff sent to various prison staff, including Warden Roehrich and Commissioner Fabian, and responses that he received from various prison personnel and administrators, including Warden Roehrich regarding his complaints.[12]  Id.  However, there is no evidence that plaintiff ever followed the formal grievance procedure set forth in DOC Policy No. 303.100 with respect to any of his 11 claims, nor has plaintiff asserted that he even attempted to pursue this procedure.  For example, while plaintiff has submitted numerous kites – many, but not all of which relate to the claims alleged in the Complaint – plaintiff never filed an Offender Grievance form with the facility grievance coordinator or a Grievance Appeal to the central office

---

[11]     This Court denied plaintiff's motion to amend to add Claim 12.  See Order dated March 28, 2008, pp. 6-8.  [Docket No. 78].

[12]     Plaintiff also communicated with the Department of Justice – Civil Rights Division, the Department of Corrections, and the Governor of Minnesota.  See e.g. Pl. Ex. B, p. 10-R (Letter to Department of Corrections dated August 8, 2006); Pl. Ex. B, p. 10-S (Letter to U.S. Department of Justice Civil Rights Division dated August 7, 2006); Pl. Ex. E, p. 45-A (Letter to Governor Tim Pawlenty dated March 30, 2007) [Docket No. 35].

grievance coordinator regarding the issues raised by the 11 claims asserted in his Complaint.  Failure to adhere to DOC's sequential grievance process after the sending of the kite to a pertinent staff member is fatal to plaintiff's suit, and substantial compliance or compliance "in spirit" with this procedure will not excuse plaintiff from the requirements for exhaustion under the PLRA.

"Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Jones, 127 S.Ct. 922-23 (emphasis added).  "The 'available' 'remed[y]' must be 'exhausted' before a complaint under § 1983 may be entertained."  Booth, 532 U.S. at 738 (emphasis added).  Proper exhaustion "means using all steps that the agency holds out, and doing so properly."  Woodford, 548 U.S. at 90 (emphasis added).  Accordingly, "to the extent plaintiff is arguing that he substantially complied with the exhaustion process by giving defendants fair notice of his claims, this argument has also been rejected by the Supreme Court.  In Woodford, the Court made it clear that partial compliance is not enough – the prisoner must follow all the procedural rules for filing grievances."  Golden v. Guerrero, 2007 WL 685938 at *3 (E.D.Cal. Mar. 5, 2007). See Fields v. Oklahoma State Penitentiary, 511 F.3d 1109, 1112 (10th Cir. 2007) ("To exhaust administrative remedies an inmate must properly comply with grievance procedures; substantial compliance is insufficient."); Lewis v. Washington, 300 F.3d 829, 834 (7th Cir. 2002) (substantial compliance doctrine not available to causes of action accrued after the effective date of the PLRA); Wright v. Hollingsworth, 260 F.3d

357, 358 (5th Cir. 2001) (prisoner alleged that he substantially complied with the prison administrative procedures by filing a Step One grievance, which put the prison on notice of his complaint and offered the authorities an opportunity to mediate the dispute; court found that because he did not pursue the grievance remedy to conclusion, and because the PLRA required him to exhaust available remedies, whatever they may be, his failure to do so prevented him from pursuing a federal lawsuit); Walker v. Woodford, 454 F.Supp.2d 1007, 1026 (S.D.Cal. 2006) ("there can be no "constructive" exhaustion under the PLRA; the inmate must exhaust the prison's administrative grievance process, and cannot simply raise his complaint with prison officials through some other means."); Johnson v. Wackenhut Corrections Corp., 130 Fed.Appx. 947, 949-950 (10th Cir. 2005) ("In order to exhaust administrative procedures, the inmate must see the grievance process to its conclusion; the doctrine of substantial compliance does not apply, and there is no exception for when the inmate fails to cure a procedural deficiency or neglects to employ available internal processes before the time expires for pursuing them.") (citation omitted)); Watford v. Kankakee Police Dept., 118 Fed.Appx. 77, 79 (7th Cir. 2004) ("Exhausting administrative remedies requires the prisoner to take all steps prescribed by the institution's grievance system"; "Complete exhaustion of [the prison's grievance] procedure is mandatory, and 'substantial compliance' with the grievance process is insufficient to satisfy the exhaustion requirement.") (citations omitted); Jackson v. Klevenhagen, 54 Fed.Appx. 591 (5th Cir. 2002) (court rejected prisoner's argument that he "substantially complied" with the exhaustion requirement by complaining directly to prison officials both orally and in writing; court held that there is no such "substantial compliance" exception to the requirements of § 1997(e)); Conway

v. Thurmer, 39 Fed.Appx. 408, 410 (7th Cir. 2002) ("the PLRA does not permit liberalized standards for pro se plaintiffs on the theory of 'substantial compliance' with exhaustion requirements) (citing Smith v. Zachary, 255 F.3d 446, 452 (7th Cir. 2001)); Shephard v. Wilkinson, 27 Fed. Appx. 526, 527 (6th Cir. 2001) ("While Shephard asserts that he has raised his complaints in numerous letters to prison and public officials, a prisoner must utilize the formal grievance process provided by the state; he cannot comply with the requirements of § 1997e(a) by informally presenting his claims."); Armstrong v. Scribner, 2008 WL 268974 at *9 (S.D.Cal. Jan. 30, 2008) (finding that plaintiff's letter to prison official, in lieu of filing grievance on standardized form, was insufficient to satisfy exhaustion requirement, court stated that "[s]ince the PLRA, substantial compliance with exhaustion rules is no longer sufficient. A prisoner must properly exhaust all claims administratively before filing suit in federal court.") (citing to Woodford, 548 U.S. at 90-91) (emphasis in original)); Garcia v. Schull, 2007 WL 295614 at *5 (D.N.D. Jan. 29, 2007) (rejecting as meritless plaintiff's argument that he substantially complied with prison grievance procedures by continually complaining to staff and stating that "Woodford does not allow for substantial compliance; it requires proper exhaustion."); Brown v. Commissioner, 2003 WL 1571699 at *3 (S.D.N.Y. Mar. 26, 2003) (even if court were to consider prisoner's letters to various prison officials to be a "constructive grievance," prisoner still failed to make any attempt to exhaust the administrative appeals process). [13]

---

[13]    The Court notes that there are cases in which "substantial compliance" with grievance procedures was considered to be sufficient for purposes of exhaustion.  For example, the Third Circuit found that "compliance with the administrative remedy scheme will be satisfactory if it is substantial."  Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004) (quoting Nyhuis v. Reno, 204 F.3d 65, 77-78 (3d Cir. 2000)).  However, the

The "benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.  The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules."  Woodford, 548 U.S. at 95.  In making this observation, the Supreme Court rejected the idea that a prisoner "wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time…and proceed directly to federal court."  Id.

The same can be said here. If the Court were to allow plaintiff to follow his own self-created procedure – which by-and-large consisted of sending numerous kites to numerous people at various levels of command – and thereby bypass the progressive administrative process contemplated by the DOC grievance procedure, the PLRA's exhaustion requirement would be rendered futile.   "[T]he PLRA required proper

---

Third Circuit has also declined to apply Spruill and Nyhuis to cases where there was no attempt to follow an established grievance procedure.  See Keys v. Craig, 160 Fed.Appx. 125, 126 n.3 (3d Cir. 2005) (stating that "[i]n Spruill, we left unresolved at what point compliance with prison grievance procedures is deemed sufficiently "substantial" to excuse procedural default. To the extent that Keys raises this issue, the instant facts do not require us to decisively resolve the question. Instead, it suffices to state that Keys' failure to even attempt compliance with the grievance procedures cannot be sufficiently substantial to act as an excuse.").  Similarly, in Wyatt v. Leonard, the Sixth Circuit found that a prisoner had "substantially complied with the exhaustion requirement by giving written notice on several occasions to prison officials."  193 F.3d 876, 880 (6th Cir. 1999).  But the Sixth Circuit also expressly conditioned that holding on the fact that it was made prior to the enactment of the PLRA: "In light of the fact that § 1997e(a) was not yet law when the [basis of the complaint] occurred or the complaints were made, the notice given by plaintiff was sufficient to satisfy the exhaustion requirement."  Id.  In addition to being distinguishable on their merits, the Court observes that these cases were decided prior to the Supreme Court's decision in Woodford.  Since Woodford, the Court is unable to locate any case where a prisoner was deemed to have substantially complied with grievance procedures when he did not utilize the available procedures.

exhaustion because without it, a prisoner would have little incentive to comply with the requirement." Garcia, 2007 WL 295614 at *4 (citing to Woodford, 548 U.S at 95).

In reaching this conclusion, the Court is cognizant that while plaintiff clearly did not follow the formal grievance procedure for any of his claims, with respect to claims 1-A, 3 and 9, he did reach the various levels of the prison and corrections staff contemplated by the procedure, including Warden Roehrich (or her assistant) who responded on behalf of herself or the Commissioner.[14]

---

[14]     With respect to Claim 1-A (regarding Officer Persing's instruction to plaintiff on July 1, 2006 to undress without assistance following a visit), plaintiff sent several communications, including kites to different prison personnel regarding this issue, including to Warden Roehrich and Commissioner Fabian. See Docket No. 35, Exs. 10, 10-H through 10-S, 21, 22, 23, 28. On July 11, 2006, the Warden's assistant wrote to plaintiff, stating she was returning to plaintiff the kite he had sent to the Warden and instructing plaintiff to follow the chain of command as set forth in Policy 303.101. Id., Ex. 10-M. (Policy 303.101 dictates that "[o]ffenders must follow the chain of command and contact only one staff at a time." Pl.'s Resp., Ex. A.) Nevertheless, on August 8, 2006, plaintiff wrote a letter to Commissioner Fabian regarding the matter. Id., Ex. 10-R.   On August 28, 2006, Warden Roehrich responded to the letter on behalf of Commissioner Fabian. Id., Ex. 27.

With respect to Claim 3 (regarding lack of adequate toilet facilities for disabled inmates such as plaintiff), on May 2, 2006, plaintiff sent kites to Commissioner Fabian and Warden Roehrich regarding this issue. See Docket No. 35, Exs. 36, 38. On May 12, 2006, Coordinator Carter responded to the kite to Warden Roehrich. Id., Ex. 38-A. On May 31, 2006, Warden Roehrich responded to this kite on behalf of Commissioner Fabian and Assistant Skon. Id., Ex. 36-A. In addition, on March 20, 2007, plaintiff wrote to Governor Pawlenty regarding the failure of MCF-Faribault to provide disabled prisoners with severe bathroom issues immediate toilet access, among other issues. Id., Exs. 45A-X. On April 20, 2007, Warden Roehrich responded to plaintiff's complaint on behalf of the Governor, Commission Fabian, Coordinator Carter and herself. Id., Ex. 45.

With respect to Claim 9, (regarding Officer McHugo's alleged harassment of plaintiff when he was in the bathroom during head-count), in May and June of 2006, plaintiff sent a kites to several prison personnel regarding this issue. Docket No. 35, 74-80.  In addition, on May 28, 2006, plaintiff sent kites to Warden Roehrich and Commissioner Fabian regarding the issue. Id., Exs. 74, 81-A. On June 21, 2006, and July 19, 2006, Coordinator Carter responded to plaintiff's kites and informed him that he had not

Nevertheless, permitting plaintiff to disregard the prison's formal grievance procedure and pursue his own remedies on his own timetable would contradict one of the stated purposes of the PLRA, which was to reduce the quantity and improve the quality of prisoner litigation through heightened efficiency.   Stated otherwise, allowing prisoners to achieve exhaustion by their own methods, would not only diminish the efficiency of the prison and the courts in addressing prisoners' claims, but would reward the very conduct the PLRA was seeking to control.  Woodford is firm that exhaustion must be proper, and here, plaintiff clearly did not properly exhaust all of his available remedies.

The Court also observes that this is not a case where plaintiff was unaware of the grievance procedure, or misunderstood it, or where prison officials thwarted his attempts to file a grievance.  The evidence in the record establishes the opposite – that plaintiff knew of the grievance procedure and deliberately chose not to follow it.  For example, on July 12, 2006, plaintiff sent a kite to Lt. Krogh, stating that Officer McHugo had been harassing him for over four years.  Docket 35, Ex. 80.  In the kite, plaintiff stated that "[t]his is not a grievance, it is a notice, so you are aware of what's going on." Id.  Similarly, on July 23, 2006, plaintiff sent a kite to Coordinator Carter regarding "out of control" guards.  Id., Ex.80-C.  Again, plaintiff states that "I am sending a NOTICE, not a grievance."  Id.

---

followed the chain of command.  Id., Exs. 74-A., 80-B.  On June 28, 2006, Warden Roehrich responded to plaintiff's kite and reminded plaintiff to follow the "Chain of Command posted in your living unit."  Id., Ex. 76-A.  On June 30, 2006, Warden Roehrich responded to plaintiff's kite on behalf of Commissioner Fabian, and attaching her response dated June 28, 2006.  Warden Roehrich stated "This issue will not be addressed again."  Id., Ex. 81.

As to plaintiff's argument that defendants waived their right to assert exhaustion as a defense because they responded in some manner to his complaints, the Court finds no support for this position.   The defense of exhaustion can be waived if not properly pleaded or raised.   Foulk v. Charrier, 262 F.3d 687, 697 (8th Cir. 2001). Additionally, where a prison has prevented a prisoner from complying with exhaustion requirements, it may be estopped from raising exhaustion as a defense.   See Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) (defendants may be estopped from raising exhaustion as a defense where their own actions inhibit the prisoner from filing a grievance).   However, a finding that defendants were somehow precluded from raising exhaustion as a defense because they responded in one fashion or another to plaintiff's informal complaints would negate the requirements of the PLRA.   In essence, it would deem defendants' responses to plaintiff's complaints as a final decision under the grievance procedure when plaintiff deliberately chose not to use the grievance procedure.   The DOC grievance procedure is explicit as to those circumstances when failure to exhaust cannot be asserted as a viable defense: upon the rendering of a final, non-appealable decision by the deputy or assistant commissioner or Commissioner (or the superintendent or warden under those circumstances permitting the bypassing of an initial formal grievance), or upon the failure of the appropriate prison or correction officials to address the formal grievance or formal appeal.   Neither circumstance occurred here.   Barring defendants from raising exhaustion as a defense when an inmate did not properly exhaust his available remedies would have the undesirable effect of deterring prison officials from responding to and resolving an inmate complaint. Inmates and prison officials are free to choose to side-step the formal grievance

procedure in an effort to resolve disputes.  But the PLRA, <u>Woodford</u> and its progeny are steadfast in their position – if an inmate wants to pursue his claims in federal court, then he must first avail himself of the formal grievance procedures dictated by the prison. Consequently, the Court finds that defendants have not waived, nor are they estopped from raising the defense of exhaustion.

Finally, with respect to plaintiff's argument that he was precluded from exhausting his administrative remedies because of the DOC's policy requiring an inmate to pay for all copies when filing a grievance, the Court finds that the record belies this claim.

"[I]nmates cannot be held to the exhaustion requirement of the PLRA when prison officials have prevented them from exhausting their administrative remedies." <u>Lyon v. Vande Krol</u>, 305 F.3d 806, 808 (8th Cir. 2002); <u>Miller v. Norris</u>, 247 F.3d 736, 740 (8th Cir. 2001) ("a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)."). The Eighth Circuit excuses inmates from complying with an institution's grievance proceedings in two circumstances: "when prison officials have prevented prisoners from utilizing the procedures, or when officials themselves have failed to comply with the grievance procedures."  <u>Gibson v. Weber</u>, 431 F.3d 339, 341 (8th Cir. 2005) (internal citations omitted).

Plaintiff appears to suggest that he was prevented from complying with the formal grievance procedure because he could not afford to pay for copies of his kites to attach to a formal grievance.  As a preliminary matter, this Court observes that numerous copies of plaintiff's letters and kites, along with the responses plaintiff received in his response to his kites and letters were submitted to this Court in support

of his claims.  See generally Docket No. 35.  It is unclear why those same copies could not have been just as easily attached to a formal grievance.  Additionally, approximately one-third of all of the kites and letters plaintiff included in Docket No. 35 are duplicates, evidencing plaintiff's ability to pay for copies.

The Court further notes that plaintiff has filed hundreds of pages of pleadings and exhibits with the Court, and has managed to send copies to defendants, and on some occasions to the Court's chambers.  Additionally, plaintiff has made regular payments toward his filing fee for the present action.  See Docket Nos. 7, 8, 17, 23, 37, 73.  As such, the Court accords little weight to plaintiff's argument that copying costs prevented him from pursuing his administrative remedies.

In any event, the Minnesota Department of Corrections policy bearing on the formal grievance process merely states that "previous kite responses must be attached to show efforts to resolve an issue."  Pl. Resp., Ex. A (DOC Policy 303.101).  There is no language in this policy mandating the attachment of copies of kites, as opposed to the original kites, or payment of copying costs as a precursor to filing a formal grievance.  Likewise, the DOC policy for the formal grievance procedure directs an offender to "attach all kite(s) used in the chain of command to which staff have responded that shows an attempt at informal resolution."  Ebeling Aff., Ex. A, p. 2.[15] There is no mention in the policy of copies or payment for copies, as a prerequisite for filing a formal grievance; rather the offender must simply attach previous kites.

---

[15]    The previous editions of the grievance procedure also direct an offender to "attach a kite to which staff have responded that shows an attempt at informal resolution."  See Gisege v. Minnesota Department of Corrections, Civ. No. 06-1353 (JRT/RLE), 2007 WL 2892024 (D.Minn. Sept. 28, 2007), Kemp Aff., Exs. 6-9, p. 2. [Gisege Docket No. 43].

Additionally, the policy provides that "supporting exhibits will be returned to the offender." Id. p. 3 (DOC Policy 303.100).[16]

The Court also notes that although generally, offenders must pay for copies at a rate of 25 cents per page, the DOC's policies for indigent offenders provide that "[a]n indigent offender may receive, free-of-charge…thirty five 35 sheets of legal and medical record photocopies per week." See DOC Policy 300.1003G(5) (Offender Banking Withdrawals);[17] DOC Policy 300.140 (Indigent Offenders).[18]   DOC Policy 300.140 provides that "[t]he offender will request -- orally or by kite, based on facility discretion, to the appropriate staff -- his/her need for personal care items, paper, photocopies and/or legal supplies." Id.   There is nothing in the record showing that plaintiff was indigent or that he applied for indigent status at MCF-Faribault, submitted a request for free copies to the prison, or that such a request for free copies was denied.

In the absence of any evidence that MCF-Faribault required an inmate to pay for copies of kites to attach to formal grievances in order to file a formal grievance, or that plaintiff was unable to file a grievance because he could not afford the copies that were allegedly required, and where plaintiff has provided copies of documents throughout this lawsuit and has made regular payments toward the filing fee associated with the suit, the Court cannot find that plaintiff was prevented or deterred from utilizing the formal grievance procedure.   Further, plaintiff has cited nothing in the record, nor has he

---

[16]     The previous editions of the grievance procedure all provide for the return of supporting exhibits to an offender. See Gisege v. Minnesota Department of Corrections, Civ. No. 06-1353 (JRT/RLE), 2007 WL 2892024 (D.Minn. Sept. 28, 2007), Kemp Aff., Exs. 6-9, p. 3. [Gisege Docket No. 43].

[17] http://www.doc.state.mn.us/DOcpolicy2/html/DPW_Display.asp?Opt=300.100.htm

[18] http://www.doc.state.mn.us/DOcpolicy2/html/DPW_Display.asp?Opt=300.140.htm

provided any sworn testimony to support the allegation that he was unable to file a grievance because he was being charged for copies, that he could not afford the copies, and that the copies were a prerequisite to filing a grievance.  Although the Court liberally construes allegations of a pro se plaintiff, White v. Kautzky, 494 F.3d 677, 680 n.1 (8th Cir. 2007), and defendants bear the burden of persuasion on the defense of exhaustion of remedies, Lenz, 490 F.3d at 993 n. 2, plaintiff must nonetheless present more than mere assertions in the pleadings for purpose of opposing a motion for summary judgment.  Accordingly, to the extent that plaintiff contends that he was unable to file a formal grievance because he could not afford to pay for copies of his previous kites, the Court finds that the argument is without factual support.

In summary, defendants presented evidence to this Court to establish that plaintiff was informed of his right to file a formal grievance, and that he did not.  Indeed, plaintiff's submissions establish that he was aware of the formal grievance procedure, and that he did not attempt to file one.  Further, plaintiff's mere suggestion that he could not file a grievance because he could not pay for allegedly required copies of his kites is insufficient to show that he was prevented from filing a formal grievance.  "[A] plaintiff must present some evidence, other than mere conclusory statements, to demonstrate that he was precluded from fully exhausting his administrative remedies."  Gisege, 2007 WL 2892024 at *11.  See also Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005) (upholding summary judgment where plaintiffs presented no evidence that any prison official thwarted an attempt to initiate the procedures or that any official made it impossible for them to file grievances); Boyles v. Park, 111 Fed.Appx. 861 (8th Cir. 2004) ("Further, while there was some evidence in the record below about problems

with the grievance process, the evidence was not specific enough to show that prison officials had prevented Boyles from administratively exhausting the issues he raised in the instant lawsuit."). See also Maddix v. Crawford, 216 Fed. Appx. 605, 606 (8th Cir. 2007) (unpublished) (claims properly dismissed for failure to exhaust administrative remedies because record did not support plaintiff's assertion that his attempt to exhaust his claims were thwarted by defendants); Sergent v. Norris, 330 F.3d 1084, 1085-86 (8th Cir. 2003) (per curiam) (finding no evidence in record that inmate was prevented from effectively utilizing grievance procedures).   In the face of specific evidence that plaintiff did not follow the grievance procedure, the Court finds that he has failed to exhaust his administrative remedies and his case must be dismissed in its entirety. Consequently, the Court recommends that defendants' motion for summary judgment be granted, and that this action be dismissed without prejudice.[19]

## **RECOMMENDATION**

Plaintiff's previously filed Motion for Discovery of Names of Successors of Defendants from Defendant Connie Roerich and Motion for Substitution of Parties [Docket No. 22] is DENIED.   Furthermore, for the reasons set forth above, it is recommended that Defendants' Motions to Dismiss [Docket Nos. 54 and 59] be GRANTED, and this action be DISMISSED WITHOUT PREJUDICE.

---

[19]   When a case is dismissed pursuant to § 1997e(a), because of the plaintiff's failure to exhaust his administrative remedies, it must be dismissed without prejudice. See Harris v. Kemna, 155 Fed.Appx. 941 (8th Cir. 2005) (unpublished opinion); Nash v. Lappin, 172 Fed.Appx. 702, 703 (8th Cir. 2006) (unpublished opinion)).

Dated:        August 6, 2008


                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge




Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before August 25, 2008 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.